[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-12039

Non-Argument Calendar

_____

GREAT AMERICAN INSURANCE COMPANY,
as subrogee of Vandernoord Partners LLP,

Plaintiff-Appellee,

*versus*

CRAIG MUELLER,
an individual,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-03170-TPB-JSS

_____

Before ROSENBAUM, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

Craig Mueller, a licensed attorney proceeding *pro se*, appeals the district court's grant of summary judgment to Great American Insurance Company, as subrogee of Vandernoord Partners LLP, on its claim for breach of contract stemming from a fuel spill caused by Mueller's yacht at Regatta Pointe Marina (the "Marina") in Palmetto, Florida. Mueller contends that, although he signed the contract, he never agreed to its terms, no consideration was given, and the contract is otherwise voidable due to fraud (because the Marina misrepresented the depth of the river channel to the marina and caused his vessel to run aground) and duress (because the Marina threatened to tow his vessel and abandon it if he did not sign a contract to lease a boat slip). After careful review, we reject Mueller's arguments and affirm the grant of summary judgment.

## I.

The relevant facts, viewed in the light most favorable to Mueller, are as follows. In mid-September 2017, Mueller contacted

the Marina about reserving a boat slip. He spoke with Dock Master Paul Van Ryn, who assured him that the river channel to the Marina was a minimum of 10 feet deep and could accommodate Mueller's vessel, the *M/V Mojave Moon*, a 78-foot Pacemaker yacht with an 8.5-foot draft. The Dock Master made the same representations to the captain of the *Mojave Moon*, Stephan Gravolet, in a separate conversation. The Marina's website at that time likewise listed the depth of the channel as a minimum of 10 feet. Based on these representations, Mueller agreed to bring his vessel to the Marina.

On the day of the transport to the Marina on October 1, however, the *Mojave Moon* ran aground in the middle of the river channel. The vessel was removed by use of a marina tow and taken to the closest marina, which was the Marina. Mueller informed Dock Master Van Ryn that, because of misrepresentations about the channel depth and the subsequent grounding of his vessel, he intended to transit to another marina as soon as possible and would not sign a lease agreement for a boat slip at the Marina ("slip agreement").

Before the *Mojave Moon* could leave the Marina, though, Captain Gravolet broke his hand when the dock collapsed underneath him. A subsequent fall caused him to leave the vessel, his usual home, on October 18, 2017. Without the yacht's captain, Mueller was unable to move the vessel as originally planned.

That same day, October 18, Mueller told Dock Master Van Ryn that he was holding Van Ryn and the Marina responsible for

the grounding of his vessel, any associated damage to the vessel, and the injury to its captain. And Mueller again indicated his intent to leave the Marina as soon as possible and to not sign any slip agreement. A few days later, Van Ryn called and threatened Mueller that the Marina would "tow his vessel out of the marina and abandon it in the river channel" if he did not sign a slip agreement.

Concerned about the safety of his vessel, Mueller ultimately signed a slip agreement for the *Mojave Moon* on November 8, 2017. Mueller claims that, in signing the agreement, he had "no intent to be bound by its terms and conditions," and he "saw signing the Agreement as the only way I could save my vessel from being towed and abandoned" by the Marina.

In mid-December 2017, the *Mojave Moon*, while docked at the Marina, began listing to starboard and discharging diesel fuel into the water. The Marina paid to contain and clean the fuel from its water and the adjacent area. The total cost of the cleanup was $95,907.42, which the Marina's insurer, Great American, reimbursed under its insurance policy.

## II.

In November 2019, Great American, as subrogee of Vandernoord Partners LLP, the Marina's owner during the relevant time, filed this state-court action against Mueller for breach of contract, negligence, and quantum meruit, seeking to recover the fuel-spill cleanup costs under the slip agreement.

After Mueller removed the action to federal district court, Great American moved for partial summary judgment on its claim for breach of contract. It submitted as evidence a copy of the slip agreement signed by Mueller, an affidavit from Dock Master Van Ryn, and an affidavit from Joanne Marziano, a Great American employee who testified as to damages. This evidence showed that the *Mojave Moon* was docked at the marina under the slip agreement when it began to discharge fuel into the water, which the insurer paid to clean up, and that the agreement required the boat owner to keep his vessel in a safe and seaworthy condition and to pay for any damages caused in connection with the use of the marina and slip.

Responding in opposition, Mueller asserted that the slip agreement was unauthenticated hearsay, that Marziano lacked personal knowledge, and that Van Ryn failed to follow the requirements of 28 U.S.C. § 1746. He also claimed that material issues of fact existed, relying on affidavits from Captain Gravolet and himself. He asserted that (a) he was fraudulently induced to sign the contract by misrepresentations about the channel's depth; (b) he "only signed the Slip Agreement under coercion and duress" from Dock Master Van Ryn and the injuries to his captain; and (c) there was no "meeting of the minds" because, despite signing the contract, he clearly indicated an intent not to be bound by its terms.

While summary-judgment briefing remained ongoing, Mueller filed a motion seeking to prevent Great American's witnesses from "giving testimony at trial" as a sanction for untimely

initial disclosures under Rule 26, Fed. R. Civ. P.  He did not request any relief in relation to the pending motion for summary judgment, nor did he raise similar arguments in his summary-judgment briefing.  In response to the sanctions motion, Great American admitted that its initial disclosures were untimely but asserted that its failure was substantially justified or harmless.  It stated that its oversight was the result of a clerical error at the beginning of the pandemic.  It also noted that Mueller was well aware of its listed witnesses and that he had received all damages-related invoices—the subject of Marziano's testimony—during discovery.

On April 30, 2021, the district court granted summary judgment to Great American on its claim for breach of contract, without addressing Mueller's motion for sanctions.  The court expressly did not rely on Van Ryn's affidavit in its ruling, citing a lack of compliance with 28 U.S.C. § 1746.

First, the district court found that Great American had established its claim for breach of contract.  The court found that a contract existed based on the agreement itself.  It rejected Mueller's contention that the slip agreement was unauthenticated, noting that he had attached a copy of the same agreement to his answer.  It also determined that Mueller breached the contract, finding it "undisputed" that fuel spilled from Mueller's vessel into Marina waters and that he did not pay the cleanup costs.  Finally, as to damages, the court concluded that Marziano's testimony about the cleanup costs was admissible and, along with the invoices attached to her affidavit, constituted prima facie evidence that the expenses

were reasonable.  And it determined that Mueller had provided no evidence to create a genuine dispute of material fact as to that issue.

Next, the district court rejected Mueller's affirmative defenses challenging the contract.  In relevant part, it determined that his fraudulent-inducement defense failed because, when he signed the slip agreement, he already knew about the depth of the river channel and so could not have relied on or been injured by the prior misrepresentations.  It also found that Mueller had not established a genuine triable issue of duress.  In the court's view, the Dock Master's threat to tow the vehicle if Mueller did not sign a slip agreement did not constitute unlawful duress because the Marina was "within its legal rights to remove the vessel" had he not done so.  The court also stated that there was no reason to invalidate the slip agreement based on Mueller's "subjective belief that he had no other option but to sign the Slip Agreement, without any evidence of wrongdoing."  It noted that that Mueller "could have hired a new captain to remove the vessel from the marina."

Following the grant of summary judgment on its claim for breach of contract, Great American dropped its remaining claims, and the court entered final judgment.  This appeal followed.

### III.

We start with Mueller's argument that the district court abused its discretion by granting summary judgment without first ruling on his motion for sanctions, which sought to bar testimony from Great American's witnesses.

We review claims that the district court mismanaged its docket for an abuse of discretion. *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366–67 (11th Cir. 1997). While the court has "broad discretion" to manage its cases, the "[f]ailure to consider and rule on significant pretrial motions before issuing dispositive orders can be an abuse of discretion" if the litigant was "materially prejudiced" as a result. *Id.* However, a party is prejudiced "only if there is a reasonable likelihood that the outcome would have been different." *Equal Emp. Opportunity Comm'n v. STME*, LLC, 938 F.3d 1305, 1322 (11th Cir. 2019) (quotation marks omitted) (holding that a district court's failure to rule on a motion was harmless where there was no reasonable likelihood of a different outcome).

To begin with, we cannot say that the district court should have ruled on the motion for sanctions before granting summary judgment. Mueller's response to Great American's motion for summary judgment, filed more than two months before the initial Rule 26 disclosures were made, did not raise any issues about the failure to disclose Van Ryn or Marziano as witnesses. Nor did the motion for sanctions request any relief in relation to the pending motion for summary judgment. Rather, it expressly sought to bar testimony "at trial." Because Mueller, a licensed attorney, did not draw any clear connection between the motion for sanctions and the motion for summary judgment, we cannot say the district

21-12039                Opinion of the Court                9

court abused its discretion by failing to raise that connection on its own.[1]

In any case, Mueller cannot show that he was materially prejudiced by the district court's failure to address his motion for sanctions because the motion was unlikely to succeed. Great American admittedly did not make timely witness disclosures as required by Rule 26. But it could still use testimony from those witnesses if the failure to timely identify them "was substantially justified or [wa]s harmless." Fed. R. Civ. P. 37(c)(1).

And here, there was little before the district court to show that Great American's failure to make timely witness disclosures under Rule 26 was anything other than harmless. Mueller cannot credibly claim he was surprised by the affidavits from Van Ryn and Marziano. In fact, he made no such argument when he first responded to those affidavits, despite the lack of any Rule 26 disclosures at that time. Moreover, he knew that Dock Master Van Ryn was a likely witness, given his own testimony where the Dock Master is prominently featured, and he does not deny that he received the billing invoices on which Marziano's testimony was based. We also note that Mueller did not raise any independent challenge to damages either in the district court or on appeal.

---

[1] Although we ordinarily construe *pro se* pleadings liberally, this rule does not apply when the *pro se* litigant is a licensed attorney, like Mueller. *Olivares v. Martin*, 555 F.2d 1192, 1194 n.1 (5th Cir. 1977).

In sum, we see no viable grounds on which to conclude that Great American's failure to comply with Rule 26 prejudiced Mueller. Nor do the other relevant factors suggest that exclusion was warranted. *See Romero v. Drummond Co.*, 552 F.3d 1303, 1321 (11th Cir. 2008) (whether exclusion is warranted depends on the explanation of the offending party, the importance of the testimony, and the prejudice to the opposing party). The error appears to have been an inadvertent clerical oversight, and the testimony was important to Great American's case.

For these reasons, Mueller has not demonstrated that a different outcome was reasonably likely had the district court ruled on his motion for sanctions before addressing the motion for summary judgment. *See STME*, 938 F.3d at 1322; *Chudasama*, 123 F.3d at 1367. In short, any error was harmless. We therefore turn to the merits of the summary-judgment ruling.

## IV.

We review the grant of summary judgment *de novo*, viewing the facts in the light most favorable to Mueller, the nonmoving party. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). Summary judgment is appropriate if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment should be denied unless, on the record evidence presented, a reasonable jury could not return a verdict for the nonmoving party. *See Mann*, 588 F.3d at 1303.

In response to a motion for summary judgment, the opposing party generally "cannot rest on his pleadings" and must instead present evidence and formulate arguments demonstrating "material facts which must be presented to a jury for resolution." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984). When a defendant raises an affirmative defense in opposition to summary judgment, he "has the initial burden of making a showing that the [affirmative] defense is applicable." *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990); *see Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006) (discussing a defendant-movant's burden of proof for affirmative defenses). In other words, the burden is on the defendant to adduce evidence supporting an affirmative defense, not upon the movant to negate its existence. *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001).

Moreover, because the parties bear the burden of formulating arguments at summary judgment, arguments not made at that time "will generally not be considered on appeal," absent exceptional circumstances. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 598–99 (11th Cir. 1995) (*en banc*). The district court is under no obligation to "distill every potential argument that could be made based upon the materials before it on summary judgment." *Id.* at 599.

Here, Mueller has not shown that the district court erred in granting summary judgment to Great American. First, Mueller claims that, despite signing the slip agreement, there are genuine

issues of material fact as to whether—leaving aside for now the defenses of fraud and duress—he manifested acceptance to its terms and whether consideration was provided.  Not so.

Under Florida law, "a party who signs a document"—even without reading it—"is bound by its terms in the absence of coercion, duress, fraud in the inducement or some other independent ground justifying rescission." *Hale v. State*, 838 So. 2d 1185, 1187 (Fla. 5th Dist. Ct. App. 2003).  There is no dispute that Mueller signed the slip agreement for the *Mojave Moon* on November 8, 2017, which made clear that it was a "INTENDED TO BE A LEGALLY BINDING CONTRACT."

Nor is there evidence that, in signing the slip agreement, Mueller made it known to the Marina that he had no intention of being bound.  The determination of "whether there has been a mutual consent to a contract" depends on the "writing itself," and sometimes other "external signs," not on the "unilateral secret intent of a party to [the] written instrument." *Gendzier v. Bielecki*, 97 So. 2d 604, 608 (Fla. 1957).  Despite his prior statements to Dock Master Van Ryn in mid-October that he would not sign a slip agreement, Mueller ultimately did just that on November 8, 2017.[2]

---

[2] Mueller's briefing gets a bit loose with the timing of events, but his own affidavit establishes the following timeline.  On or about October 1, after the *Mojave Moon* ran aground and was towed to the Marina, Mueller informed Dock Master Van Ryn of his intent not to sign a slip agreement.  A little over two weeks later, "on or about October 18, 2017," Mueller "again had a heated conversation with Dock Master Van Ryn" about the grounding of his vessel and the injury to its captain, stating that he would not sign a slip agreement.

Nothing in the record indicates any other contact between Mueller and the Marina in the interim. So that Mueller privately intended not to be bound by the contract is not relevant because mutual assent does not depend on "the unilateral secret intent of a party to a written instrument." *Id.* at 608–09.

Mueller did not raise his claim that the agreement lacked consideration before the district court at summary judgment, so that claim is not properly before us on appeal. *See Resolution Trust*, 43 F.3d at 598–99. In any case, this claim lacks merit because the terms of the slip agreement plainly reflect an exchange of promises—monthly rent for a boat slip—that constitutes consideration. *See Johnson Enters. of Jacksonville v. FPL Grp., Inc.*, 162 F.3d 1290, 1311 (11th Cir. 1998) ("In a bilateral contract, the exchange of promises by both parties constitutes consideration.").

Next, the district court correctly rejected Mueller's defense of fraud in the inducement. A claim of fraudulent inducement is based on "misrepresentations, statements or omissions which cause the complaining party to enter into a transaction." *Allen v. Stephan Co.*, 784 So. 2d 456, 457 (Fla. 4th Dist. Ct. App. 2000). Despite the Marina's prior false statements about the depth of the river channel, which of course influenced Mueller's decision to

---

Then, "[o]n or about two days after speaking to Mr. Van Ryn about [his] Captain's injury"—on October 20, in other words—Mueller received a call from Van Ryn threatening to tow his vessel from the Marina if he did not sign a slip agreement.

attempt transport on October 1, Mueller was fully aware of the actual facts when he signed the contract on November 8. As a result, he could not have reasonably relied on the false statements. *See Oceanic Villas, Inc. v. Godson*, 148 So. 2d 689, 690 (Fla. 1941) (stating that a contract may be invalidated where it was "procured by fraud and misrepresentation as to a material fact, the truth or falsity of which was known only to the [party seeking to enforce the contract]").

We recognize that Mueller contends more broadly that he suffered damages to his vessel and its captain in reasonable reliance on the Marina's misrepresentation about the depth of the river channel. But Mueller raised fraudulent inducement as a defense to an action for breach of contract, not as an independent claim based on the Marina's conduct more generally.[3] Because Mueller did not rely on the misrepresentation about the channel's depth in signing the contract, the misrepresentation does not present grounds to invalidate the contract. *See id.*

Finally, on the current record, no reasonable jury could conclude that Mueller established that the contract was the product of duress. Duress is a condition of the mind produced by an improper external pressure or influence that practically destroys the free agency of a party. *Cooper v. Cooper*, 69 So. 2d 881 (Fla. 1954). To

---

[3] The district court denied Mueller's motion for leave to file a third-party complaint against the Marina's owner, Vandernoord Partners, and Mueller does not challenge that ruling on appeal.

demonstrate duress, a party must show "(1) that one side involuntarily accepted the terms of another, (2) that circumstances permitted no other alternative, and (3) that [those] circumstances were the result of coercive acts of the opposite party." *Woodruff v. TRG–Harbour House, Ltd.*, 967 So. 2d 248, 250 (Fla. 3d Dist. Ct. App. 2007).

Here, the facts in evidence, even construed in Mueller's favor, fall well short of the legal standard for duress. Mueller claims that he signed the agreement only to save his vessel after the Dock Master threatened to remove it from the Marina and abandon it in the river channel. We agree with the district court, though, that it appears the Marina would have been within its rights to remove Mueller's vessel if he refused to execute a lease. And "it is not improper and therefore not duress to threaten what one has a legal right to do." *City of Miami v. Kory*, 394 So. 2d 494, 498 (Fla. 3d Dist. Ct. App. 1981).

To the extent the Dock Master's threat expressed or implied some illegal action, such coercive conduct did not create circumstances that permitted no other alternative than signing the slip agreement. *See Woodruff*, 967 So. 2d at 250. First, there does not appear to have been any immediacy to the threat. According to the timeline in Mueller's affidavit, the Dock Master's threat occurred on October 20, more than two weeks before Mueller signed the slip agreement on November 8. He therefore had time to consider his options and make an informed decision.

Second, the record contains no evidence that the Marina took any coercive action to prevent Mueller from removing the *Mojave Moon* from the Marina on his own. In fact, it appears Mueller had made plans for the vessel to leave the Marina before the injury to its captain. Mueller does not suggest that the Marina intentionally injured his captain, even if he holds it responsible. That Mueller faced practical difficulties in moving the vessel, such as hiring a temporary captain or paying for a marine tow to another marina, is not alone enough to show duress. While those difficulties certainly influenced his decision to sign, they do not demonstrate he had no other alternative than signing the slip agreement to avoid the threatened consequences. *See Woodruff*, 967 So. 2d at 250.

Aside from the arguments addressed above, Mueller's initial brief does not otherwise challenge the district court's determinations that he materially breached the slip agreement by failing to pay for the cleanup costs caused by his vessel or that Great American suffered damages in the amount of $95,907.42. Any argument along these lines has therefore been abandoned. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–81 (11th Cir. 2014) (issues not briefed on appeal are abandoned).

While Mueller's reply brief revives his contention in the district court that the slip agreement was unauthenticated and therefore not proper evidence, we do not consider arguments raised on appeal for the first time in a reply brief. *See Hi-Tech Pharma., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1194 (11th Cir. 2018) ("[A]n

appellant must directly challenge each of the district court's grounds in his initial brief; challenges that are merely hinted at or that first appear in a reply brief do not merit consideration."). We also note that Mueller does not appear to dispute that the agreement is authentic or that he signed it; rather, the gist of his defense is that the agreement cannot be enforced for various reasons, which we have considered and rejected.

In sum, and for the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Great American on its claim for breach of contract against Mueller.

**AFFIRMED.**